UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: STRYKER LFIT V40 FEMORAL HEAD PRODUCTS LIABILITY LITIGATION | |
| This Document Relates to:<br><br>All Cases | MDL No. 17-md-2768-IT |

## PLAINTIFFS' LEADERSHIP'S MOTION TO ALLOW REIMBURSEMENT OF COMMON BENEFIT EXPENSES

Pursuant to MDL Order 13 [Dkt. 941], this Court authorized an assessment of settled cases to provide reimbursement of attorneys' expenses to members of the Plaintiffs' Executive Committee ("PEC") and Plaintiffs' Steering Committee ("PSC") (collectively referred to as "Plaintiffs' Leadership")[1]. Due to the Plaintiffs' Leadership's efforts over the past several years, hundreds of cases have settled and another large group of filed cases were carefully reviewed and found to be unqualified, resulting in voluntary dismissals. The Settlement Oversight Committee ("SOC"), a subsection of Plaintiffs' Leadership tasked with the oversight of the 2018 and 2021 settlements, believes it timely to request the court to enter an order authorizing the identified Qualified Settlement Fund ("QSF") Administrator, Archer Systems, Inc. ("Archer"),[2] to disburse retained Common Benefit Costs incurred by Plaintiffs' Leadership members as described below

---

[1] This Court's MDL Order No. 8 [Doc. 183], set forth the broad duties and responsibilities of Co-Lead counsel, Administrative Counsel, State Liaison counsel, Plaintiffs' Executive Committee ("PEC"), and the Plaintiffs' Steering Committee ("PSC"). MDL Order No. 11 [Doc. 183], modified MDL Order No. 8 and appointed individuals to serve in the positions outlined in MDL Order No. 8.

[2] The Court's November 2, 2018 Order Aiding Private Settlement [Dkt. 889] identified Archer Systems, Inc. as the appointed Settlement Administrator. MDL Order 13 [Dkt. 941] identified Archer at the Qualified Settlement Fund ("QSF"). Moreover, the Parties jointly agreed in the 2018 and 2021 Master Settlement Agreements to appoint Archer as the Lien Resolution Administrator ("LRA") for the settlements.

1

and to return any additional funds denominated for costs to those settling clients from whom said funds were collected.

## BACKGROUND

From the time that the V40 femoral heads were launched in the United States until the recall of certain models of the product in 2016, many of these devices were implanted in the United States. In August of 2016, defendant Howmedica Osteonics Corp. ("HOC") recalled certain sizes and lots of the V40 cobalt chrome femoral head related to higher-than-expected complaints of taper lock failure. On May 22, 2018, the recall was extended to encompass all V40 cobalt chromium heads sized 36mm and larger that were manufactured before March 4, 2011. Despite the recall, HOC has vigorously defended these cases for more than five years. Moreover, cases in the litigation also include V40 femoral heads that were not on the recall list due to their size or manufacturing date, posing additional challenges.

Plaintiffs' Master Long Form Complaint asserts various claims and damages arising out of several causes of action including negligence; negligence per se; strict products liability – defective design, manufacturing defect and failure to warn; breach of express warranty; and punitive damages. [Dkt. 249-1, ¶1; Counts I-XV.] HOC has disputed these claims. To resolve the disputed facts and allegations, Plaintiffs' Leadership undertook a significant amount of work and expense to establish the elements of liability, causation, and damages.

Additionally, during the course of this litigation, there were extensive negotiations and some motion practice over electronic discovery protocols, deposition guidelines, and protective orders which were contentious, but ultimately resolved. The parties negotiated a Case Questionnaire, Plaintiff and Defense Fact sheets, a Direct Filing Order, Long Form and Short Form complaints, and detailed document discovery demands, including interrogatories. HOC

produced thousands of pages of documents. Plaintiffs' Leadership spent a substantial number of hours reviewing and analyzing these documents to build their case. Plaintiffs' Leadership also prepared for and undertook Rule 30(b)(6) depositions.

Plaintiffs' Leadership also spent a tremendous amount of time to understand the complex scientific issues in this litigation and to develop expert testimony for trial, including experts specializing in biomedical engineering, histopathology, and immunology. Plaintiffs' Leadership consulted with world renowned experts in those fields from four countries, and the expertise laid the foundation for a highly technical and scientifically complex case. Plaintiffs' Leadership also consulted with experts in several other fields including orthopedic surgery, epidemiology, FDA regulation, and toxicology.

On December 8, 2017, this Court issued its Order Governing the Bellwether Selection and Trial Process (see CMO 4 [Doc.531]), which set forth the process for categorization and selection of bellwether cases requiring a bellwether nominee pool of eighteen (18) cases. The process of reviewing and evaluating the potential pool of bellwether cases required hundreds of hours of review of plaintiff fact sheets, medical and other records of the many cases in suit and multiple meetings of numerous members of leadership.  Prior to the selection of the final bellwether cases, pursuant to the order of New Jersey Superior Court Judge Rachelle Harz in the parallel and cooperating state court litigation, the litigation was sent to mediation before Retired Magistrate Judge Diane Welsh. As a result of an ultimately successful mediation process that spanned numerous sessions and meetings over many months, the bellwether process did not continue. Nevertheless, the massive amount of review, analysis and briefing related to the bellwether selection process was necessary for the benefit of all plaintiffs if the settlement discussions were unsuccessful. Moreover, the effort was helpful in educating the parties following the detailed

analysis of a large number of cases, which better informed their negotiating and decision-making positions.

Plaintiffs' Leadership members have spent substantial time and money to prosecute this litigation. In this litigation, this Court, together with Judge Rachelle Harz of the New Jersey Superior Court of Bergen County, sought to foster cooperation in this litigation with the Plaintiffs' Leadership from New Jersey.  This cooperation and communication resulted in a coordinated group of Plaintiffs' attorneys from the MDL as well as the cooperating state court jurisdictions working together to prepare and advance this litigation together at all stages from initial discovery all the way through settlement. While each Court maintained its jurisdictional independence, the cooperation and communication fostered by the presiding Judges and achieved by the respective leadership of the Plaintiffs and Defense counsel, resulted in an efficient, fair and productive litigation.

As a result of the collective effort and coordination of Plaintiffs' Leadership and the assistance of the jointly appointed mediator (Hon. Diane Welsh, Ret.), on November 2, 2018, the parties were able to reach a nationwide settlement available to hundreds of identified Plaintiffs who underwent revisions of their LFIT V40 femoral heads.

On the same day this Court entered an order appointing the SOC to aid in establishing procedures and processes to effectuate the settlement. The SOC was charged with providing notices to eligible claimants; providing details of the settlement to counsel; working with the Claims Administrator (Archer) to perform settlement administrative duties; working with the court-appointed Third-Party Neutral, Hon. Diane M. Welsh (Ret.), who reviewed orders and findings, rendered decisions on settlement appeals; and reporting progress to the Court.

A material term of the 2018 LFIT V40 settlement was the SOCs assumption of the

responsibility to create a settlement matrix and to fully administer the process of funds allocation and distribution. In essence, the Defendant agreed to pay a fixed sum to settle a large inventory of cases but retained no responsibility for how the funds were distributed or how the settlement was to be administered. That obligation and cost fell solely on the SOC.

The SOC painstakingly created an allocation matrix and a distribution plan all of which was reviewed and approved by our Third-Party Neutral. The SOC also obtained advice from an independent ethics counsel who is a law professor expert in aggregate settlements to ensure the process was compliant with the ethics rules on aggregate settlements, and to tailor an appropriate informed consent letter and process. Once approved, the SOC had at least two separate counsel independently review every settling Plaintiff's medical records multiple times to determine where they fit into the matrix. Values for base awards and enhancements were established to ensure the sum of proposed individual awards did not exceed the total amount HOC had agreed to pay. Once the SOC felt comfortable that it did, award determinations were generated and distributed to all Plaintiffs in the settlement.

Each Plaintiff had the right to appeal both their base award and any enhancement awards contained in the determination letter. If any claimant felt the SOC had made an error in either base or enhancement awards, they had the right to appeal. The SOC reviewed all appeals and those that could not be resolved by the SOC and counsel were then reviewed by the Third-Party Neutral and a final determination was made. Ultimately, every appeal was decided. Following this allocation process, the participation threshold for the 2018 settlement was met and HOC funded the total settlement to Archer as QSF Administrator. Archer then addressed the task of resolving governmental and private health care liens and distributed funds to individual counsel to be transmitted to their respective clients.

Following the November 2, 2018 settlement both the MDL and MCL entered a stay so the SOC could process the settlement. During that time additional cases were filed. The Parties disagreed as to the quality of remaining cases and the newly filed cases, however, the Parties did agree that some cases did not qualify for the litigation, including cases with wrong product identification or other disqualifying factors. Plaintiffs' Leadership spent substantial time carefully vetting each filed case, with multiple attorneys reviewing each individual case. The SOC also contacted each attorney to discuss the case and worked with Plaintiffs' counsel to achieve the voluntary dismissal of a large group of unqualified cases. During this time the SOC also followed up with counsel on discovery deadlines and continued to review each newly filed case.  This time-consuming process benefited future settling cases as HOC would not even entertain a future settlement when palpably unqualified cases remained in suit.

Additional settlement negotiations commenced in 2021. Defendant selected the cases it was willing to negotiate and affirmatively excluded some from the discussion. On December 16, 2021, the Parties announced a second settlement concerning the large inventory of cases selected by Defendant. Once again, the SOC was responsible for the administration of the settlement. The SOC undertook the painstaking responsibility of reviewing every single settled case multiple times in order to apply the settlement matrix criteria, including extraordinary injury fund ("EIF") claims, entailing hundreds of hours of review.

Participation thresholds for the 2021 settlement have been met, and HOC has transmitted the total settlement funds to the Qualified Settlement Fund administrator, and the first round of distributions to the respective Plaintiffs' law firms have occurred. As with the 2018 settlement, Archer is also responsible for the lien resolution. The SOC coordinated with Archer to facilitate the settlement administration, as described below. In addition to the settlement, the SOC also

negotiated several orders regarding ongoing discovery, a mediation process for unsettled and later occurring head dissociation cases, and a process in which to file new cases. These results are a testament to the determination and resolve of Plaintiffs' Leadership in obtaining fair results for all Plaintiffs in this litigation

## SETTLEMENT ADMINISTRATION

Following the execution of the 2018 and 2021 Master Settlement Agreements ("MSAs"), SOC had to oversee and implement the settlement program. As noted above, a great deal of work has been necessary to effectuate the terms of the MSAs and to implement processes for administrating the claims of plaintiffs participating in the settlement program.

Members of the SOC worked with Defense Counsel and the Claims Administrator (Archer) to create claims forms, releases, stipulations, and other documents necessary to determine the validity and value of claims submitted. Plaintiffs' liaison counsel spent (and continues to spend) an enormous amount of time fielding phone calls and emailed questions from the various counsel with clients in the settlement and provided guidance on procedure and the terms. The creation of a fair and equitable settlement matrix which was applied to all cases based upon objective legal and medical criteria and derived from how Defendants valued the different types of cases was a very laborious process involving guidance from the Third-Party Neutral. SOC members also have communicated extensively with counsel representing individual plaintiffs to provide information regarding the MSAs, the submission of claims and appeals, claim valuations and reductions, lien resolution, funding and disbursements.

SOC members have routinely participated in discussions and meetings with the Claims Administrator and Defense Counsel to ensure that claims were being consistently and accurately processed in accordance with terms of the MSAs.

Given the high costs of medical bills for revision surgeries, health care liens were a major obstacle to resolution in the 2018 and 2021 settlements. The SOC interacted frequently with the Lien Resolution Administrator (Archer) to successfully resolve these liens.

### **COMMON BENEFIT DOCTRINE**

The Supreme Court, over 100 years ago, approved the common benefit doctrine, which provides that when the efforts of a litigant or attorney preserve, protect, increase, or discover a common fund, all who benefit from the fund must contribute proportionately to the costs of the litigation. *See Boeing, Co. v. Van Gemert,* 444 U.S. 472 at 479 (1980); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 at 123 (1885); *Trustees v. Greenough*, 105 U.S. 527 at 532-33 (1881).

Noting its inherent power to do so, this Court issued a Common Benefit Order, establishing the Common Benefit Fund:

> This Order is entered to provide for the fair and equitable sharing among plaintiffs, and their counsel, of the burden of services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs in this complex litigation… The governing principles are derived from the United States Supreme Court's common benefit doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881); refined in, *inter alia*, *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); and approved and implemented in the MDL context, in, *inter alia*, *In re MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); and *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977).

MDL Order 13, Common Benefit Order at 1-2 [Doc. 941].

In MDL Order No. 13, this Court provided for a 4% holdback for common benefit attorneys' fees and 2% for costs. Taking into account the expense of pushing forward the litigation and the result obtained, 2% is appropriate for the reasonable and necessary costs.

Common benefit attorneys have incurred significant expense from the inception of the MDL through the date of the initial settlement on November 2, 2018 and continuing through the more recent settlement date of December 16, 2021. Plaintiffs' Leadership and firms appointed to the SOC continued to work and incur expenses for the benefit of all plaintiffs and claimants to administer the settlement program and to perform all necessary duties.

### REIMBURSEMENT OF RETAINED COMMON BENEFIT EXPENSES

MDL Order 13 sets forth to provide for fair and equitable sharing among Plaintiffs' Leadership for the time and expenses incurred by attorneys for the common benefit off all attorneys in this litigation. [Dkt. 941][3]. The order allowed for reimbursement of expenses that were: 1) for the common benefit, 2) appropriately authorized by the PEC and timely submitted, 3) under the limitations of the Order, 4) verified, and 5) approved by this Court. *Id*. The Order outlines shared and held costs. Shared costs include costs for certain court filings, depositions, document depositories, administrative expenses, accountant fees, expert witness costs, printing, research, bank charges, investigative costs, mediation fees, certain other costs. Archer's costs included settlement administrative fees, Qualified Settlement Fund administration, Medicare and other governmental lien verification costs, and lien questionnaire administration. Held costs include costs such as travel, meals, postage costs and other costs held by each law firm. These costs must meet the criteria of MDL Order 13 and are subject to certain limitations.

The Order also provided a common benefit funding method by establishing a 2% cost and 4% fee assessment on all cases that were settled. To further the court's directive, the QSF Administrator has, out of both the 2018 and 2021 settlements, deducted from each settlement the above percentages for fees and costs and placed those funds in separate escrow accounts.

---

[3] As noted above, this motion addresses just reimbursement of the incurred costs. Fees can be addressed in a separate motion.

The SOC has collected the itemized expenses of all members of the Plaintiffs' Leadership or other counsel who performed common benefit work. A list of those firms with qualifying expenses and their respective totals and is attached hereto as Exhibit A. The SOC has reviewed the reasonableness and necessity of those submitted expenses and whether those expenses are permitted under this Court's MDL Order 13. Counsel has certified that the submitted expenses comply with MDL Order 13 and a thorough audit has been completed.

In addition to the expenses advanced by each Firm, Plaintiffs' Leadership pooled certain funds to pay for various additional expenses including, but not limited to, an e-discovery company that maintained and searched millions of pages of produced documents. The SOC has reviewed the reasonableness and necessity of those expenses and whether those expenses are permitted under the Court's MDL Order 13. The SOC certifies that these expenses totaling $650,859.79 comply with MDL Order 13 and a thorough audit has been completed.

As the Court is aware, the assessment of common benefit expenses was 2% of each settled case. **The total amount of the V40 Common Benefit Expense Fund exceeds the amounts being sought in this motion. Plaintiffs' Leadership, therefore, requests that the remaining amount be returned to each settling Plaintiff on a pro rata basis.**[4]

Wherefore, the SOC respectfully asks for the Court to enter the following Order:

1. Approving the expenses that have been advanced by the Plaintiffs' Leadership attorneys identified in Exhibit A and ordering the QSF Administrator to transfer the approved amounts from the V40 Common Benefit Expense Fund to the respective leadership attorneys;

---

[4] The confidentiality of the total settlement amounts are material terms of the 2018 and 2021 settlements. As a result, specific dollar amounts for the cost assessment and other totals which might violate the settlement confidentiality terms have been omitted from this motion. However, if the Court requires additional information, Plaintiffs' Leadership and HOC will jointly provide it to the court *in camera*.

2. Approving the expenses that have been advanced by the Plaintiffs' Leadership's pooled funds in the amount of $650,859.79 and ordering the QSF Administrator to reimburse the approved amount from the V40 Common Benefit Expense Fund to Plaintiffs' Leadership's pooled fund; and

3. Ordering the QSF Administrator to reimburse all settling plaintiffs (through his or her respective attorney) his or her pro rata share of any common benefit expenses collected and held by the QSF Administrator in the V40 Common Benefit Expense Fund that are in excess of those expenses approved by this Court and further relief as the Court deems equitable and just.

Dated: December 23, 2022

*Plaintiffs' Settlement Oversight Committee*

| | |
|---|---|
| MEYERS & FLOWERS | BERNHEIM KELLEY, LLC |
| /s/ Peter J. Flowers | /s/Walter Kelley |
| Peter J. Flowers | Walter Kelley, Esquire |
| 225 W. Wacker Drive, Suite 1515 | Four Court Street |
| Chicago, IL 60606 | Plymouth, MA 02360 |
| Phone: (312) 214-1017 | Phone: (508) 747-8854 |
| Email: pjf@meyers-flowers.com | Email: walterkelley@duejustice.com |

*Co-Lead Counsel*

| | |
|---|---|
| WEITZ & LUXENBERG | SEARCY DENNEY SCAROLA BARNHART & SHIPLEY P.A. |
| /s/ Ellen Relkin | /s/ Calvin Warriner, III |
| Ellen Relkin | Calvin Warriner, III |
| 700 Broadway | 2139 Pal Beach Lakes Blvd. |
| New York, NY 10003 | West Palm Beach, FL 33409 |
| Telephone: (212) 558-5500 | Phone: (561) 686-6300 |
| | Email: ccw@searcylaw.com |

*Administrative Counsel*

MESHBESHER & SPENCE

/s/Ashleigh Raso
Ashleigh Raso
1616 Park Avenue
Minneapolis, MN 55404
Phone: (612) 339-9121
Email: Araso@meshbesher.com

**CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)**

I, Peter J. Flowers, hereby certify that Plaintiffs' Settlement Oversight Committee has conferred with Kim M. Catullo, counsel for defendant HOC prior to filing the SOC's Motion to Allow Reimbursement of Common Benefit Expenses. HOC has no objections to filing the motion, but does not take a position on the amounts requested by the SOC.

Dated: December, 23,2022                    /s/  *Peter J. Flowers*
                                                 Peter J. Flowers
                                                 MEYERS & FLOWERS
                                                 225 W. Wacker Drive, Suite 1515
                                                 Chicago, IL 60606
                                                 Phone: (312) 214-1017
                                                 Email: pjf@meyers-flowers.com

**CERTIFICATION OF SERVICE**

I hereby certify that on December 23, 2022, a copy of the foregoing Plaintiffs' Settlement Oversight Committee's Motion to Allow Reimbursement of Common Benefit Expenses was filed electronically in the Master Docket. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/ *Ashleigh Raso*
Ashleigh Raso